IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

In re

LARRY D. GRAVES

        Debtor

Case No.  05-33620

**MEMORANDUM ON MOTIONS TO REJECT
EXECUTORY CONTRACT AND TO LIFT THE AUTOMATIC STAY**

**APPEARANCES:**   JOHN P. NEWTON, JR., ESQ.
  9700 Westland Drive
  Suite 101
  Knoxville, Tennessee  37922
  Attorney for Debtor-in-Possession

        HAGOOD, TARPY & COX, PLLC
  T. Lynn Tarpy, Esq.
  900 South Gay Street
  Suite 2100
  Knoxville, Tennessee  37902
  Attorneys for BG Stayin Alive Properties, LLC

        RICHARD F. CLIPPARD, ESQ.
        UNITED STATES TRUSTEE
  Patricia C. Foster, Esq.
  Becky H. Halsey, Esq.
  800 Market Street
  Suite 114
  Knoxville, Tennessee  37902
  Attorneys for United States Trustee

**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

Presently before the court are the following contested matters: (1) the Motion to Reject Executory Contract filed by the Debtor on June 30, 2005, as amended by the Amended Motion to Reject Executory Contract filed on July 7, 2005 (Motion to Reject); and (2) the Motion by BG Stayin Alive Properties, LLC, to Lift the Automatic Stay (Motion for Relief) filed on July 19, 2005.

An evidentiary hearing on the Motion to Reject and Motion for Relief was held on October 3, 2005. The record before the court consists of eleven exhibits stipulated into evidence, together with the testimony of two witnesses, Donald B. Dickey, Chief Manager of BG Stayin Alive Properties, LLC (BGSA), and the Debtor.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A), (G) (West 1993).

I

On January 18, 2002, the Debtor, on behalf of BGSA, executed the Second Modification Agreement and the Second Amended and Restated Citizens Bank of Blount County Variable Interest Rate Note in the amount of $2,500,000.00 in favor of Citizens Bank of Blount County (CBBC), which was secured by a Deed of Trust dated June 29, 2000, on property known as Lot 4, the Market Place Subdivision, Knox County, Tennessee. COLL. EX. 9. The Note was also guaranteed by the individual members of BGSA, including the Debtor. The Second Modification Agreement details the loan history between BGSA and CBBC, beginning with a Promissory Note executed in June 2000, in the amount of $1,550,000.00 and culminating with the consolidation of all amounts due plus an increase to

2

$2,500,000.00. *See* COLL. TRIAL EX. 9. Additionally, on November 26, 2002, the Debtor executed a Stock Assignment Separate from Certificate (Stock Assignment) which states the following:

> FOR VALUE RECEIVED, Larry D. Graves hereby sell [sic], assign [sic] and transfer [sic] unto Citizens Bank of Blount County One Hundred Thousand (100,000) Shares of the Common Capital Stock of the IdleAir [sic] Technologies Corp. standing in Larry D. Graves [sic] name on the books of said corporation represented by Certificate No. 0024 herewith and do hereby irrevocably constitute and appoint Kevin Renfro, Attorney, attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises.

TRIAL EX. 4. Sometime thereafter, CBBC took possession of the IdleAire Technologies Corporation (IdleAire) Certificate No. 0024.

A dispute later arose between the members of BGSA with respect to the use of proceeds from the Debtor's refinancing of the BGSA property located on Cedar Bluff Road in Knoxville, Tennessee. To resolve the dispute, the Debtor and the remaining members of BGSA, BG Stayin Alive Equipment Partners, LLC, Friendship I, LLC, and Crib-Tenn, LLC entered into a Settlement Agreement on November 19, 2002, whereby the Debtor agreed to withdraw from BGSA and to pay $1,000,000.00 to BGSA on or before July 1, 2005, in exchange for the release of the Debtor's individual guaranty to CBBC. TRIAL EX. 1.[1] To secure this obligation, the Debtor granted BGSA a junior lien against the 100,000 shares of

---

[1] On March 20, 2003, CBBC and the Debtor entered into an Agreement, wherein CBBC agreed to release the Debtor's individual guaranty of the BGSA promissory note if the Debtor transferred his interest in BGSA to the remaining members, and he executed a new guaranty of the debt limited to $750,000.00 to be honored only if collection of the debt from the eight remaining members does not result in payment. TRIAL EX. 10. This second guaranty, executed by the Debtor, arises out of the "Note dated 6-29-00 in the amount of $2,500,000.00 & is subject to Agreement dated 3-20-03," and it is marked as "unsecured." TRIAL EX. 11.

IdleAire stock represented by Certificate No. 0024. TRIAL EX. 1 at ¶ 3; *see also* TRIAL EX. 3. In addition, the Settlement Agreement granted each party the following options to be exercised on or before July 1, 2005: to the Debtor, the option of acquiring all of the membership interests of BGSA for the purchase price of $3,250,000.00, and to BGSA, the option to purchase 15,000 of the 100,000 shares of IdleAire stock "subject to the security interest . . . held by CBBC" for the purchase price of $1.00 per share. TRIAL EX. 1 at ¶¶ 4, 5. On July 25, 2003, BGSA notified the Debtor that it was exercising its option by purchasing the 15,000 of the 100,000 shares of IdleAire stock represented by Certificate No. 0024 for $15,000.00. *See* TRIAL EX. 2; TRIAL EX. 3. BGSA paid the $15,000.00 to the Debtor, but it never received the stock, because it was held by CBBC.

On June 1, 2004, the Debtor filed a Voluntary Petition commencing a case under Chapter 11 of the Bankruptcy Code. This case was dismissed on June 1, 2005, upon the Debtor's inability to propose a confirmable plan of reorganization. On June 30, 2005, the Debtor filed the Voluntary Petition commencing the present Chapter 11 bankruptcy case.[2] The Debtor additionally filed the Motion to Reject, asking the court to allow him to reject the Settlement Agreement with BGSA. On July 22, 2005, BGSA filed the Response by BG Stayin Alive Properties, LLC, to Debtor's Motion to Reject Executory Contract, arguing that the court should deny the Motion to Reject as moot, because the Settlement Agreement is no longer executory.

---

[2] Since the commencement of the case, the Debtor has acted as debtor-in-possession pursuant to 11 U.S.C.A. § 1107 (West 2004).

BGSA filed its Motion for Relief on July 19, 2005, asking the court to lift the automatic stay so that it could pursue its remedies at law with respect to the IdleAire stock transferred to CBBC on November 26, 2002, and pledged to BGSA under the Settlement Agreement. The Debtor filed his Objection to Motion for Relief on July 30, 2005, arguing that BGSA's security interest in the IdleAire stock arose under the Settlement Agreement, which he was attempting to reject, therefore, BGSA did not hold a perfected security interest in the stock. Furthermore, the Debtor contends that he has equity in the stock, which is necessary for an effective reorganization.

## II

Pursuant to the Pre-Trial Order entered on September 7, 2005, the issues the parties ask the court to resolve are as follows: (1) is the Settlement Agreement an executory contract; (2) can the Debtor reject the Settlement Agreement; (3) does rejection of the Settlement Agreement result in elimination of the security agreement with respect to the IdleAire stock; (4) whether cause exists to grant BGSA relief from the automatic stay pursuant to 11 U.S.C.A. § 362(d)(1) (West 2004); and (5) whether BGSA is entitled to relief from the automatic stay pursuant to 11 U.S.C.A. § 362(d)(2) (West 2004) because the IdleAire stock has no equity and is not necessary for an effective reorganization. Based upon the evidence presented at trial, however, the court finds that many of these issues are moot because the Debtor no longer owns the 100,000 shares of IdleAire stock represented by Certificate No. 0024.

On November 26, 2002, the Debtor executed the Stock Assignment introduced into evidence as Trial Exhibit 4. The Stock Assignment unequivocally states that the Debtor "sell[s], assign[s], and transfer[s]" his 100,000 shares of IdleAire stock represented by Certificate No. 0024 to CBBC. *See* TRIAL EX. 4. At trial, the Debtor testified that CBBC used this form document, but it was the intention of both the Debtor and CBBC to simply grant CBBC a security interest in the IdleAire stock. The Debtor did not, however, present a representative from CBBC to substantiate his testimony as to the parties' intentions with respect to the Stock Assignment. Furthermore, "in the absence of fraud or mistake, a contract must be interpreted and enforced as written, even though it contains terms which may seem harsh or unjust." *Gray v. Estate of Gray*, 993 S.W.2d 59, 64 (Tenn. Ct. App. 1998). The "usual, natural, and ordinary meaning of the contractual language," that the IdleAire stock was being sold, assigned, and transferred to CBBC, effectuated a transfer in the ownership of the IdleAire stock, not simply the granting of a security interest therein. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Irrespective of the Debtor's testimony of the parties' intentions, the fact is that the Stock Assignment served as an absolute transfer of the IdleAire stock to CBBC rather than CBBC's perfection of a secured interest in the stock.[3]

---

[3] In Tennessee, perfection of a security interest in stock certificates, such as the IdleAire stock, is excepted from the financing statement filing requirements of TENN. CODE ANN. § 47-9-310(a) (2001). *See* TENN. CODE ANN. § 47-9-310(b)(5). Pursuant to TENN. CODE ANN. § 47-9-314(a), a security interest in stock is perfected by "control" of the certificate. *See* TENN. CODE ANN. § 47-9-310(b)(5); *see also* TENN. CODE ANN. § 47-9-313(a) ("A secured party may perfect a security interest in certificated securities by taking delivery of the certificated securities under § 47-8-301."). As is relevant to the issues presently before the court, "[a] purchaser has 'control' of a certificated security in bearer form if the certificated security is delivered to the
(continued...)

CBBC filed a secured claim in the amount of $837,297.64, which it states is secured by "money loaned on property secured by deed." COLL. TRIAL EX. 9.  The Debtor argues that the fact that CBBC filed a secured claim evidences its intention that the Stock Assignment did not actually transfer the IdleAire stock, but instead, merely granted CBBC a security interest therein.  The court finds, however, that the documents attached to CBBC's proof of claim filed in the Debtor's case on July 27, 2005, provide additional support for its findings that the Stock Assignment actually transferred ownership of the IdleAire stock to CBBC versus merely providing it with a security interest.

Attached to the proof of claim are the following documents:  (1) a renewal note of the Debtor, individually, dated November 26, 2003, in the amount of $51,949.19; (2) a refinance note of the Debtor, individually, dated April 13, 2004, in the amount of $28,108.78; (3) the Third Modification Agreement between BGSA and CBBC dated January 31, 2005, changing the interest rate and the maturity date on the $2,500,000.00 loan; (4) the Second Modification Agreement between BGSA and CBBC dated January 18, 2002, for the $2,500,000.00 loan; (5) the Second Amended and Restated Citizens Bank of

---

[3](...continued)
purchaser," TENN. CODE ANN. § 47-8-106, and "[d]elivery of a certificated security to a purchaser occurs when: (1) [t]he purchaser acquires possession of the security certificate[.]" TENN. CODE ANN. § 47-8-301(a). "A security interest in investment property is perfected by control under § 47-9-106 [referencing § 47-8-106] from the time the secured party obtains control and remains perfected by control until:  (1) the secured party does not have control; and (2) . . . (A) if the collateral is a certificated security, the debtor has or acquires possession of the security certificate." TENN. CODE ANN. § 47-9-314(c).  Furthermore, "[a] security interest held by a secured party having control of investment property under § 47-9-106 has priority over a security interest held by a secured party that does not have control of the investment property." TENN. CODE ANN. § 47-9-328(1); *see also* Off. Cmt. 3 ("[T]he control priority rule is intended to ensure that, with respect to investment property, secured parties who do obtain control are entirely unaffected by filings.").

Blount County Variable Interest Rate Note between BGSA and CBBC dated January 18, 2002, for the $2,500,000.00 loan; (6) a Modification Agreement between BGSA and CBBC dated August 1, 2001; (7) a receipt dated August 1, 2001, evidencing the recording of the Modification Agreement and payment of the mortgage tax of $533.12; (8) an Amended and Restated Citizens Bank of Blount County Variable Interest Rate Note between BGSA and CBBC dated August 1, 2002, in the amount of $2,000,000.00; (9) a Citizens Bank of Blount County Variable Interest Rate Note between BGSA and CBBC dated June 29, 2000, in the amount of $1,500,000.00.  *See* COLL. TRIAL EX. 9.

One document that is conspicuously missing from those listed above is the Stock Assignment. Moreover, none of the documents attached to CBBC's proof of claim state that they are secured by 100,000 shares of IdleAire stock, and in fact, the IdleAire stock is not mentioned in any of these documents. At trial, the Debtor acknowledged that although he thought that he was pledging the IdleAire stock to secure BGSA's loan with CBBC, *see* TRIAL EX. 1., he now realizes that he did not. This is further evidenced by the fact that the Debtor's Guaranty dated March 23, 2003, concerning the $2,500,000.00 BGSA loan with CBBC, states that it is unsecured. *See* TRIAL EX. 11.

Nevertheless, CBBC did file a secured proof of claim, indicating its belief that the amounts owed it by the Debtor are, in fact, secured by collateral. The first note, dated June 29, 2000, states that it "is secured by a Deed of Trust of even date herewith on property briefly described as follows: Lot 4, The Market Place Subdivision, Knox County, Tennessee." COLL. TRIAL EX. 9. The first amended note, dated August 1, 2002, states that

it "is secured by a Deed of Trust dated June 29, 2000, modified as of August 1, 2002, on property briefly described as follows: Lot 4, The Market Place Subdivision, Knox County, Tennessee." COLL. TRIAL EX. 9. The second amended note, dated January 18, 2002, also states that it "is secured by a Deed of Trust dated June 29, 2000, modified as of August 1, 2002, on property briefly described as follows: Lot 4, The Market Place Subdivision, Knox County, Tennessee." COLL. TRIAL EX. 9. No Deed of Trust is attached to CBBC's proof of claim.

The Debtor's individual renewal note, dated November 26, 2004, states that it is secured by a "security agreement of even date[,]" but there is no security agreement attached to this proof of claim, and the Debtor's individual refinance note, dated April 13, 2004, does not state that it is secured. Absent proof to the contrary, the court finds that the Stock Assignment itself, coupled with CBBC's actual possession of the stock, evidences that the Debtor no longer owns the 100,000 shares of IdleAire stock represented by Certificate No. 0024.

Because the Debtor no longer owned the 100,000 shares of IdleAire stock pledged to BGSA through the Settlement Agreement when he filed his bankruptcy case on June 30, 2005, it is not necessary for the court to grant BGSA relief from the automatic stay to pursue its interests and rights in the IdleAire stock because the stock, not being owned by the Debtor, is not property of the estate subject to the automatic stay.

### III

The court must still determine the issues centering around the Settlement Agreement; i.e., whether it is an executory contract that may be rejected, and if so, whether such rejection eliminates the grant of an otherwise valid security interest. The Debtor is authorized, by virtue of 11 U.S.C.A. § 365 (West 2004), to reject any executory contract.[4] Although "executory contract" is not a defined term within the Bankruptcy Code, the generally accepted definition is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Carson*, 286 B.R. 645, 648-49 (Bankr. E.D. Tenn. 2002) (quoting *Rieser v. Dayton Country Club Co. (In re Magness)*, 972 F.2d 689, 694 (6th Cir. 1992) (quoting Vern Countryman, *Executory Contracts in Bankruptcy, Part 1*, 57 MINN. L. REV. 439, 460 (1973))).

"[I]n determining whether the contract is executory, [the court] should work backward from an examination of the purposes to be accomplished by rejection and, if they have already been accomplished, then the contract cannot be said to be executory." *Magness*, 972 F.2d at 694. In other words, executory contracts "are agreements which

---

[4] Rejection denies the right of the contracting creditor to require the bankrupt estate to specifically perform the then executory portions of the contract. Rejection also limits the creditor's claim to damages for breach of contract. [Its] statutory purpose . . . is to enable the [debtor] to assume those executory obligations which are beneficial to the estate while rejecting those which are onerous or burdensome to perform.

*Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n*, 826 F.2d 434, 436 (6th Cir. 1987).

include an obligation for the debtor to do something in the future." *Chattanooga Mem'l Park v. Still (In re Jolly)*, 574 F.2d 349, 351 (6th Cir. 1978) (citing S. REP. NO. 94-458, 95th Cong. 1st Sess. (1975)). "[U]nless both parties have unperformed obligations [when the bankruptcy was filed] that would constitute a material breach if not performed, the contract is not executory under § 365." *Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995).

"The materiality of any remaining unperformed obligation is evaluated according to the relevant non-bankruptcy law." *Kent's Run P'ship, Ltd. v. Glosser*, 323 B.R. 408, 415 (W.D. Pa. 2005). Thus, "[a]lthough federal law defines the term 'executory contract,' 'the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law.'" *Carson*, 286 B.R. at 649 (quoting *Terrell v. Abaugh (In re Terrell)*, 892 F.2d 469, 471-72 (6th Cir. 1989)).

Based upon the evidence presented, the court finds that the Settlement Agreement is not executory, and therefore, it cannot be rejected by the Debtor. When the parties executed the Settlement Agreement on November 19, 2002, it was clearly executory, as it required performance of various obligations by both parties. However, on the day that the Debtor filed his bankruptcy case, June 30, 2005, it appears that the only remaining obligations left under the Settlement Agreement were the Debtor's payment of $1,000,000.00 and his option to acquire BGSA's membership interests, both to be performed on or before July 1, 2005, and his release from liability to CBBC. "Ordinarily, an obligation

11

to pay money under a contract does not render it executory." *Kaye v. A.R.E. Distribution & Alpine Records, LLC (In re Value Music Concepts, Inc.)*, 329 B.R. 111, 123 (Bankr. N.D. Ga. 2005). Additionally, in cases involving an option, the court should

> look to outstanding obligations at the time the petition for relief is filed and ask whether both sides must still perform. Performance due only if the optionee chooses at his discretion to exercise the option doesn't count unless he has chosen to exercise it. An option may on occasion be an executory contract, for instance, where the optionee has announced that he is exercising the option, but not yet followed through with the purchase at the option price.
>
> The question thus becomes: At the time of filing, does each party have something it must do to avoid materially breaching the contract? Typically, the answer is no; the optionee commits no breach by doing nothing.

*Unsecured Creditors' Comm. of Robert L. Helms Constr. & Dev. Co. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co, Inc.)*, 139 F.3d 702, 706 (9th Cir. 1998).

Here, there are no repercussions if the Debtor does not exercise his option to acquire the BGSA membership interests. Additionally, with respect to the Debtor's release from liability to CBBC, the court makes two specific observations. First, the Debtor himself agreed to allow his liability for the $2,500,000.00 loan made to BGSA to continue, by virtue of the March 20, 2003 Guaranty. Second, the paragraph concerning this release states as follows:

> 1. <u>Withdrawal from BGSA</u>. At such time as Graves is released from all obligations under the guaranty in the amount of $750,000.00 executed by Graves in favor of CBBC, Graves will withdraw from BGSA and have no further ownership interest in BGSA, subject to the terms of this Agreement. Until the release of such guaranty, Graves will remain a member of BGSA and shall remain subject to the terms of the Operating Agreement of BGSA, including the provisions related to additional capital contributions and the dilution of a member's interest in BGSA if such member fails to make a required capital contribution.

12

TRIAL EX. 1 at ¶ 1. The Settlement Agreement does not expressly state that BGSA will obtain a release of the Debtor's guaranty to CBBC. It provides that if the Debtor was not released from the guaranty, then he was not required to withdraw from BGSA subject to the terms of the Settlement Agreement. The promise to pay $1,000,000.00 to BGSA was not dependent upon the Debtor's release from liability, nor was his granting of a security interest in the IdleAire stock to BGSA. The court does not find that the failure to be released from liability of the CBBC $2,500,000.00 loan is a material breach of the Settlement Agreement such as to render it executory under § 365.

Based upon the evidence before the court, the Settlement Agreement is not executory and cannot be rejected by the Debtor because it was basically performed. Furthermore, because the Settlement Agreement cannot be rejected, the issue concerning BGSA's security interest is moot.[5]

In summary, the court finds that the Settlement Agreement is not executory, and therefore, it cannot be rejected by the Debtor pursuant to 11 U.S.C.A. § 365. The Debtor's Motion to Reject will therefore be denied. Furthermore, the court finds that, on the date he filed for bankruptcy, the Debtor no longer owned the 100,000 shares of IdleAire stock represented by Certificate No. 0024, which were pledged to BGSA under the Settlement Agreement dated November 19, 2002, because those shares were sold, assigned, and transferred to CBBC on November 26, 2002, by virtue of the Stock Assignment. Therefore,

---

[5] BGSA's security interest in the IdleAire stock is in actuality a non-issue because of the Debtor's absolute transfer of the stock to CBBC on November 26, 2002, seven days after the Settlement Agreement was executed.

those shares of IdleAire stock were never property of the Debtor's bankruptcy estate, and the Motion for Relief filed by BGSA shall be denied as moot.

An order consistent with this Memorandum will be entered.

FILED:  October 25, 2005

          BY THE COURT

          /s/  RICHARD STAIR, JR.

          RICHARD STAIR, JR.
          UNITED STATES BANKRUPTCY JUDGE